## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BENEDICT KATELY**                                    **CIVIL ACTION**

**versus**                                                          **NO. 10-1057**

**BURL CAIN, WARDEN**                          **SECTION: "J" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Benedict Kately, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On June 17, 2003, he was convicted of first degree murder under

Louisiana law.[1]   On October 2, 2003, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]   On May 19, 2004, the Louisiana Fourth Circuit Court of appeal affirmed that conviction and sentence.[3]   Petitioner did not challenge that judgment by filing a writ application with the Louisiana Supreme Court.[4]

On April 27, 2005, petitioner filed with the state district court an application for post-conviction relief.[5]   After holding an evidentiary hearing on November 16, 2007,[6] the district court denied the application on July 17, 2008.[7]   Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on February 2, 2009,[8] and by the Louisiana Supreme Court on January 22, 2010.[9]

---

[1] State Rec., Vol. II of III, transcript of June 17, 2003, p. 208; State Rec., Vol. I of III, minute entry dated June 17, 2003.

[2] State Rec., Vol. I of III, minute entry dated October 2, 2003.

[3] State v. Kately, No. 2004-KA-0073 (La. App. 4th Cir. May 19, 2004) (unpublished); State Rec., Vol. II of III.

[4] See Rec. Doc. 3, p. 20.

[5] State Rec., Vol. III of III.

[6] Rec. Doc. 17-1, transcript of November 16, 2007.

[7] Rec. Doc. 20-1, transcript of July 17, 2008.

[8] State v. Kately, No. 2008-K-1071 (La. App. 4th Cir. Feb. 2, 2009) (unpublished); State Rec., Vol. III of III.

[9] State ex rel. Kately v. State, 25 So.3d 133 (La. 2010) (No. 2009-KH-0685); State Rec., Vol. III of III.

On March 15, 2010, petitioner filed the instant application for *habeas corpus* relief. In support of his application, he claims that he received ineffective assistance of counsel.[10]

Timeliness

The state argues that petitioner's federal application is untimely. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A).[11]

As noted, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence on May 19, 2004. Therefore, under § 2244(d)(1)(A), his criminal judgment became "final" on June 18, 2004, when his period expired for filing a writ application with the Louisiana Supreme Court. See Louisiana Supreme Court Rule X, § 5(a) (a litigant has thirty days to file a writ application to challenge a judgment of a Louisiana intermediate appellate court); see also Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008). Accordingly, his period for seeking federal *habeas corpus* relief commenced on that date and expired one year later, unless that deadline was extended through tolling.

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review

---

[10] Rec. Doc. 3.

[11] Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, the alternative provisions are not applicable in the instant case.

attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).  After three

hundred twelve (312) days elapsed, petitioner tolled the federal limitations period on April 27, 2005,

by filing a post-conviction application with the state district court.  Tolling then continued

uninterrupted for the duration of the post-conviction proceedings, so long as petitioner sought

supervisory review in a timely manner.  <u>Grillette v. Warden, Winn Correctional Center</u>, 372 F.3d

765, 769-70 (5th Cir. 2004).  The state concedes that petitioner sought supervisory review in a

timely manner;[12] therefore, the Court finds that tolling continued until the Louisiana Supreme Court

denied relief on January 22, 2010.

At that point, petitioner had fifty-three (53) days of the federal limitations period

remaining.  Accordingly, his federal application had to be filed by March 16, 2010.  Because he filed

his federal application on March 15, 2010,[13] the application is timely.  In light of that fact, the Court

will address the merits of petitioner's claim.[14]

---

[12] Rec. Doc. 21, p. 3.

[13] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  <u>Roberts v. Cockrell</u>, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner declared under penalty of perjury that he placed his application in the prison mailing system on March 15, 2010.  Rec. Doc. 3, p. 14.  The state has offered no evidence rebutting that declaration.

[14] The state halfheartedly contends that petitioner's claim may not be properly exhausted; however, even the state, to its credit, acknowledges the flaws of that contention.  Rec. Doc. 21, pp. 10-11.  Moreover, a federal court has the authority to deny *habeas* claims on the merits, regardless of whether the petitioner exhausted state court remedies and whether exhaustion is waived by the state.  28 U.S.C. § 2254(b)(2); <u>Jones v. Jones</u>, 163 F.3d 285, 299 (5th Cir. 1998); <u>Woods v. Cain</u>, Civil Action No. 06-2032, 2008 WL 2067002, at *8 n.8 (E.D. La. May 13, 2008).  Because petitioner's claim clearly has no merit, the undersigned recommends that it simply be considered and rejected on the merits in the interest of judicial economy.

Standards of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact.   The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

– 5 –

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Courts cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

<u>Facts</u>

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> The trial record indicates that late on the evening of September 13, 2002, police officers Kevin Bradley and his partner responded to the call of a shooting at 715 N. Johnson Street in the Lafitte Project. They found the victim, Kendron Anderson, lying on the floor of an upstairs apartment. Mr. Anderson had been shot once in the chest. Officer Bradley testified that he spoke with Ernestine Howard, who had witnessed the shooting, as well as with the resident of the apartment, who indicated she heard gunshots and then the victim and Ms. Howard ran through her door. Officer Bradley testified that he and his partner responded within two minutes of the call of the shooting, and he also testified that Ms. Howard did not tell him the shooter had pointed his gun at her. The officer also testified that he spoke with Ms. Howard for only about a minute, and then he secured the scene.
>
> The 911 tape of the call about the shooting was played for the jury after the parties stipulated to its authenticity. In addition, the parties stipulated that if the forensic pathologist who performed the autopsy on Mr. Anderson were to testify, he would testify that Mr. Anderson died of a single gunshot wound to the chest.
>
> Det. John Hunter of the Homicide Division testified at trial that by the time he arrived on the scene of the murder, the victim had already been taken to the hospital. He went to the hospital, where he learned Mr. Anderson had died. Det. Hunter testified that he did not speak with Ms. Howard on the night of the murder because she left the scene prior to his arrival, and he soon had to respond to another, unrelated homicide a few blocks away. Det. Hunter testified that on September 17th, four days after the shooting, Ms. Howard's mother contacted him and told him that Ernestine had witnessed the shooting and wanted to discuss the case with him. He testified that he met with Ernestine, who was fourteen at the time, and her mother on September 18th. At that time, Ernestine told him that she and the victim were sitting on the porch of 715 N. Johnson Street when they

were approached by two males, one with dreadlocks and the other with a towel over his head, who participated in the shooting. Det. Hunter testified that Ernestine gave him a vague description of both men, and she indicated that she thought the actual shooter might have gone to Clark High School. She also indicated that the shooter had pointed a gun at her. Det. Hunter further testified that Ernestine was crying and scared during this interview.

The next day, Detective Hunter testified, he and his partner canvassed the neighborhood of the shooting and learned the shooting, might have been committed by Eric Hill and "Benji". At the police station they learned "Benji" was the defendant Benedict Kately. Det. Hunter testified that he compiled lineups containing Kately's and Hill's photographs. He took the lineups with him when he met with Ernestine and her mother that evening at Clark High School, where he made arrangements for Ernestine to view student photos on the school's computer system. Det. Hunter testified that Ernestine first picked up the lineup containing Kately's photo, looked through the lineup, and then put the stack down. She picked up the lineup containing Hill's photo, looked through the lineup, and put that stack down. She then picked up the first lineup again and identified the photograph of Kately as being that of the person who shot Mr. Anderson.

Det. Hunter also testified that he, his partner, Ernestine, and her mother then went to police headquarters where Ernestine gave a taped statement concerning the murder. In this statement, she indicated that the shooter's name was Benji, and she indicated he was wearing shells woven into his hair. She also indicated Kately pointed his gun at her and tried to fire, but the gun jammed. Det. Hunter admitted that Ernestine did not mention this on the tape until he questioned her about it. She stated that the other man with Kately also fired his gun, but he shot only at the porch. Det. Hunter testified Ernestine also indicated a few other men were on the scene just prior to the shooting, and Det. Hunter testified that he attempted unsuccessfully to find these men.[FN 1] He admitted that Ernestine's statement that the shooter pointed the gun at her after Mr. Anderson had been shot and had run up the stairs contradicted the initial police report, which indicated Ernestine said she ran up the stairs in front of Mr. Anderson. He also admitted that Ernestine never mentioned Kately's name or nickname prior to viewing the lineup. He agreed that Kately never attended Clark High School.

[FN 1]  Apparently one was in jail at the time of trial.

Det. Hunter further testified that he obtained an arrest warrant for Kately and a search warrant for the residence where he believed Kately lived.  He executed the search warrant at that address, which he learned was Kately's grandmother's house, and seized no evidence.  The detective then went to another address obtained from Kately's grandmother, but Kately was not there.  Det. Hunter also testified that he later learned that Kately had surrendered at a police station.  He arrested Kately and seized his clothing, which was tested for gunpowder residue and blood.[FN 2]

> [FN 2]  The parties later stipulated there was no blood on the clothing seized from Kately at the time of his arrest.

Det. Edward Colmenero testified at trial that he was Det. Hunter's partner in the investigation.  His testimony basically tracked that of Detective Hunter.  In addition, he testified that after making the photo identification, Ernestine indicated the shooter's nickname was "Benji".  Det. Colmenero also testified that after choosing Kately's photo, Ernestine wrote on the back of it:  "I saw the person in Picture No. 5 shoot Kunta [the victim] at 715 North Johnson."  Det. Colmenero identified Kately as the man depicted in that photograph.  He testified that the transcript of Ernestine's statement, which was supplied to the jury, was incorrect in that it showed Ernestine identified the shooter as "Benny" rather than "Benji".  However, Det. Colmenero testified that Ernestine stated that the shooter was "Benji".

Ernestine Howard testified at trial that she was fifteen years old at the time of trial and fourteen when Mr. Anderson was murdered.  She testified that she knew the victim from the Lafitte Project, and they customarily hung out on the porch at 715 N. Johnson St. every Friday night (the murder occurred on a Friday night).  Ernestine testified that before the shooting she and Mr. Anderson were sitting on the porch when a man named Marvin Banks walked up and spoke with them.  She further testified that approximately fifteen minutes later, Kately and another man walked past them.  At that point, Banks left her and Mr. Anderson to meet with a group of men standing in the driveway, and the group walked off.  She identified these men as Jack, Jarred, Aaron, Lee, and Keith.  Ernestine testified that Kately and his companion then walked back up to her and Mr. Anderson and asked them if they knew anyone who

had marijuana.  When they indicated they did not, Kately pulled a gun and shot Mr. Anderson.  Ernestine testified that the other man shot toward the porch but did not hit Mr. Anderson.  She testified that Mr. Anderson turned and ran up the stairs.  At that point, Kately walked around behind her, pointed the gun at her, and pulled the trigger, but the gun jammed.  She testified that the men then ran from the scene, and she ran up the stairs to find Mr. Anderson lying on the floor.  She testified that her cousin who lived upstairs from the shooting called the police.

Ernestine further testified that when the police officers arrived, she gave them a description of the assailants, but at that time she was not aware she knew the shooter.  She testified that she told the officers one shooter had braids and shells in his hair, and the other one had a towel around his head.  Ernestine also testified that later on the night of the shooting she dreamed about the shooting and realized she knew the shooter from the neighborhood, possibly a person who she knew from Wheatley school, and who "drove around" Clark High School with his friends.  She testified she told her mother, who told a friend, and that friend's brother called the police.  Through this route, her mother contacted Det. Hunter.

Ernestine testified that she and her mother met with Det. Hunter.  Ernestine maintained that at this first interview she told Det. Hunter that Kately had pointed the gun at her and pulled the trigger.  She testified that she and her mother later met with the detectives at Clark High School, where she chose Kately's photograph from the first lineup.  Her testimony concerning the lineup procedure tracked that of Dets. Hunter and Colmenero.  She testified that neither officer indicated whose photo she should choose.  She and her mother then accompanied the detectives to police headquarters where she gave a taped statement.  She testified that before the tape recorder was turned on, the officers only told her they were going to tape her statement.  She testified that in the statement she identified the shooter as "Benji".  She further testified that she also told the officers in the statement about Kately pointing the gun at her and trying to shoot her.  She insisted that she did not tell the responding officers about this on the night of the murder because she was scared.  She denied telling the responding officers that she ran up the stairwell in front of Mr. Anderson after he had been shot.  She also testified that although the area where the shooting occurred was somewhat dark, she had seen Kately in the area earlier that night.  When confronted with her testimony at a prior hearing that Kately had spoken with her and Mr. Anderson for thirty minutes prior to shooting  Kately [sic],

Ernestine testified that she meant to say thirty seconds, not thirty minutes. Ernestine also testified that she was positive Kately was the person who shot Mr. Anderson and tried to shoot her.

Deidra Howard testified at trial that she is Ernestine's mother. She testified that at the time of the shooting, she (Deidra) was running errands, and by the time she found out about it Ernestine had already gone to the home of Deidra's brother across the river because Ernestine was afraid to stay in the Lafitte Project. Deidra further testified that for the next few days Ernestine was scared and crying. Deidra testified that when she and her other children came home from church a few days after the shooting, she noticed Kately sitting in a parked car across from her apartment, and she indicated that Kately stared at her for a period of time before leaving. Deidra testified that she finally told a friend about Ernestine witnessing the shooting, and that friend's brother called the police and put her in contact with Det. Hunter. Deidra testified that on September 19th, Det. Hunter picked up her and Ernestine from the home of Deidra's brother and took them to Clark High School, where the detectives showed Ernestine two photo lineups. Deidra testified that the officers only told Ernestine to look at the photos and let them know if she recognized anyone. Deidra testified that Ernestine chose Kately's photo from one of the lineups, and that she and Ernestine then accompanied the officers to police headquarters, where Ernestine gave the officers a taped statement. Later, Ernestine [sic] testified that she went to live with relatives in Oklahoma for a time. Deidra further testified that Ernestine positively identified Kately as the man who shot Mr. Anderson.

Linda Anderson identified a photograph of her son, Kendron Anderson. She testified her son died at Charity Hospital on the night of the shooting.[15]

<u>Ineffective Assistance of Counsel</u>

Petitioner claims that he received ineffective assistance of counsel. The United States

Supreme Court established a two-prong test for evaluating such claims. A petitioner seeking relief

must demonstrate that counsel's performance was deficient *and* that the deficient performance

---

[15] <u>State v. Kately</u>, No. 2004-KA-0073, at pp. 1-7 (La. App. 4th Cir. May 19, 2004) (unpublished); State Rec., Vol. II of III.

prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id</u>.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793.

When petitioner asserted his ineffective assistance claim to the state district court, it was denied after an evidentiary hearing.[16]  Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal[17] and the Louisiana Supreme Court.[18]  Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).  For the following reasons, the Court finds that neither of those conditions is met in the instant case.

---

[16] Rec. Doc. 17-1, transcript of November 16, 2007; Rec. Doc. 20-1, transcript of July 17, 2008. In that second transcript, the judge indicated that he had prepared a written judgment; however, a copy of that judgment does not appear in the state court record furnished for this Court's review.

[17] <u>State v. Kately</u>, No. 2008-K-1071 (La. App. 4th Cir. Feb. 2, 2009) (unpublished); State Rec., Vol. III of III.

[18] <u>State <i>ex rel.</i> Kately v. State</u>, 25 So.3d 133 (La. 2010) (No. 2009-KH-0685); State Rec., Vol. III of III.

Petitioner claims that counsel was ineffective for failing to call Tyrone Jordan and Devon Mitchell to testify at trial.[19]  However, it is clear that "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002).  Therefore, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense.  Id.; see also Bray v. Quarterman, 265 Fed. App'x 296, 298 (5th Cir. 2008).

Unlike most prisoners who come before this Court asserting similar claims, petitioner has in fact been able to show that Jordan and Mitchell were available to testify and would have done so in a manner seemingly beneficial to the defense.  He made those showings at a state post-conviction hearing at which both Jordan and Mitchell testified.[20]

At that hearing, Jordan testified that he was petitioner's first cousin.  Jordan stated that he knew petitioner was innocent because he was with him elsewhere at the time the murder was committed.  Jordan stated that, on the night of the murder, he and petitioner took a drive, went to

---

[19] Petitioner repeatedly alleges that counsel failed even to interview Jordan and Mitchell; however, that allegation has never been substantiated and the evidence is to the contrary.  At the post-conviction hearing, counsel testified that he was assisted in his pretrial preparation by a investigator and that both witnesses were interviewed in advance of trial. Rec. Doc. 17-1, transcript of November 16, 2007, pp. 23-24 and 26-29.  Further, Mitchell even admitted that she spoke to defense counsel. Id. at p. 16.  While Jordan testified that he "didn't talk to the attorney at all," that comment, taken in context, could fairly be interpreted as only a statement that Jordan did not speak to the attorney *on the day of trial* before the sequestration order was entered. Id. at p. 9.

[20] The transcript of that hearing can be found at Rec. Doc. 17-1.

– 14 –

see a DJ, played video games, and then went to a daiquiri shop.  When Jordan brought petitioner

home later that night, police were already on the scene investigating the crime.

Jordan further testified he appeared for petitioner's trial to testify to those facts.  After

the judge ordered sequestration of the witnesses, Jordan waited outside the courtroom to be called

to testify, but he was never called.

At that same post-conviction hearing, Mitchell testified that she is also petitioner's

first cousin.  She testified that she, too, knew petitioner was innocent because she saw the two

individuals who were involved in the crime.  She was in the area, saw two men go around the

building to the porch where the killing occurred, and heard shooting seconds later.  She did not

recognize the men but was certain that neither man was petitioner.  She also appeared at trial to

testify, and she was likewise sequestered but never called.

While it would appear that Jordan and Mitchell would have been witnesses beneficial

to the defense, petitioner's trial counsel, Harry Boyer, Jr., also appeared at the post-conviction

hearing and testified that the witnesses were not called for strategic reasons.  He explained:

> During the trial, the eyewitness testified that it came to her in a dream
> that Mr. Kately was the person that she saw kill one person and
> attempt to shoot her as she was fleeing.
>
> She said she had seen Mr. Kately, I believe – this is my
> recollection.  This is not gospel, but this is what I recollect.  That she
> knew Mr. Kately from the neighborhood, around by school, or
> something like that – that they had gone to high school together, I
> believe.
>
> And that after the shooting that occurred, that she had a dream
> one night, after seeing Mr. Kately somewhere on the street, in a car.
> Then she had a dream and she remembered his name.
>
> And we thought, at the conclusion of the State's case – when
> the State rested – Mr. Smith [an investigator for the Indigent Defense
> Program], myself, and I believe Mr. Kately, decided that should we

> call these witnesses – his three alibi witnesses – and they make a
> mistake or the[y] stumble or they sweat or the jury doesn't like the
> way they look – that, that would do more harm to Mr. Kately's
> defense than good.[21]

Boyer further stated that he made the decision not to call the witnesses after consulting other

attorneys from his office for their advice.[22]

Where, as here, a decision not call witnesses was based on trial strategy, federal

*habeas* courts are loath to find deficient performance.  Green v. Cockrell, No. 02-20650, 2003 WL

21145722, at *2 (5th Cir. Apr. 29, 2003) ("A strategic or tactical decision not to call particular

witnesses does not constitute ineffective assistance."); Buckelew v. United States, 575 F.2d 515, 521

(5th Cir. 1978) ("[C]omplaints based upon uncalled witnesses are not favored, because the

presentation of testimonial evidence is a matter of trial strategy ...."). While, in hindsight, it perhaps

might have been better to call Jordan and Mitchell, this Court cannot base its decision on such

hindsight.  As the United States Supreme Court has explained:

> Judicial scrutiny of counsel's performance must be highly
> deferential.  It is all too tempting for a defendant to second-guess
> counsel's assistance after conviction or adverse sentence, and it is all
> too easy for a court, examining counsel's defense after it has proved
> unsuccessful, to conclude that a particular act or omission of counsel
> was unreasonable.  A fair assessment of attorney performance
> requires that every effort be made to eliminate the distorting effects
> of hindsight, to reconstruct the circumstances of counsel's challenged
> conduct, and to evaluate the conduct from counsel's perspective at
> the time.  Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption that counsel's
> conduct falls within the wide range of reasonable professional

---

[21] Rec. Doc. 17-1, transcript of November 16, 2007, p. 24.

[22] Rec. Doc. 17-1, transcript of November 16, 2007, p. 27.

> assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Moreover, not only is the use of hindsight forbidden, but the Court is also further constrained by the standards imposed on it by the AEDPA.  As the United States Supreme Court recently explained, federal *habeas corpus* review of ineffective assistance of counsel claims is doubly deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ----, ----, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S.Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then

continued:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases *where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.*  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.  *As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Id. at 786-87 (citations omitted) (emphasis added).  The Supreme Court then explained that federal

*habeas corpus* review of ineffective assistance claims is therefore doubly deferential:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 788 (citations omitted) (emphasis added)

Faced with those constraints, this Court simply cannot say that the state court's decision rejecting petitioner's claim was so beyond the pale that it was not entitled to deference. On the contrary, as petitioner notes in his federal application, the evidence against him was hardly conclusive, in that there was no physical evidence connecting him to the crime and his identification was based on a single eyewitness whose testimony was based in part on a dream. In light of those facts, counsel opted to try to discredit the state's case rather than taking the chance of alienating the jury by presenting the testimony of Jordan and Mitchell. Counsel was unsure those witnesses could be relied upon to testify convincingly. Moreover, it was likely that their testimony would have been viewed by the jury with suspicion because they were both closely related to petitioner and, therefore, hardly disinterested. <u>See, e.g.</u>, <u>Ball v. United States</u>, 271 Fed. App'x 880, 884 (11th Cir. 2008) (Petitioner's wife, brothers, and cousin "were all close family members with a strong motive to fabricate an alibi defense for him. As such, their testimony would not have been particularly compelling and would have been subjected to vigorous impeachment. If trial counsel had called these alibi witnesses and the jury had disbelieved them, the jury also could have inferred that

[petitioner] was in fact the [perpetrator].”); <u>Lewis v. Cain</u>, Civ. Action No. 09-2848, 2009 WL 3367055, at *11 (E.D. La. Oct. 16, 2009) (noting that petitioner’s “grandmother’s testimony would have been of limited value because her close familial relationship to the petitioner would have made her testimony inherently suspect”); <u>Sholes</u>, 2008 WL 2346151, at *15 (noting that petitioner’s girlfriend would be an inherently suspect alibi witness); <u>Talley v. Cain</u>, Civ. Action No. 08-3542, 2009 WL 916331, at *11 (E.D. La. Apr. 6, 2009) (noting that alibi testimony from the petitioner’s mother would have been inherently suspect); <u>United States <i>ex rel.</i> Emerson v. Gramley</u>, 902 F.Supp. 143, 147 (N.D. Ill.1995) (noting that petitioner’s mother was an “interested witness” and, therefore, “would not have provided persuasive evidence of an alibi”), <u>aff’d</u>, 91 F.3d 898 (7th Cir. 1996).

Clearly, counsel is allowed to balance such factors and make such a decision.  As the United States First Circuit Court of Appeals has expressly noted:

> The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.  The witness may not testify as anticipated or the witness’s demeanor or character may impress the jury unfavorably and taint the jury’s perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused.

<u>Lema v. United States</u>, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted).  The court continued:

> Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government’s witnesses, rather than presenting additional testimony which could appear to legitimate the government’s case or raise questions about the defense not previously suggested by the government’s evidence.

<u>Id</u>; <u>see also</u> <u>Sholes v. Cain</u>, Civ. Action No. 06-1831, 2008 WL 2346151, at *14-15 (E.D. La. June 6, 2008), <u>aff’d</u>, 370 Fed. App’x 531 (5th Cir. 2010), <u>cert. denied</u>, 131 S.Ct. 292 (2010).

For all of these reasons, the Court finds that petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition of **Benedict Kately** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[23]

New Orleans, Louisiana, this eighth day of February, 2011.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[23] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.